```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   PAUL CULBERTSON, individually
     and on behalf of all others
 4   similarly situated,,

 5                   Plaintiff,

 6            v.                              20 CV 3962 (LJL)

 7   DELOITTE CONSULTING LLP,

 8                   Defendant.              Conference
                                            (via Telephone)
 9   ------------------------------x
                                            New York, N.Y.
10                                          February 15, 2022
                                            4:00 p.m.
11
     Before:
12
                          HON. LEWIS J. LIMAN,
13
                                            District Judge
14

15                           APPEARANCES

16   LEVIN FISHBEIN SEDRAN & BERMAN
            Attorneys for Plaintiff
17   BY:  CHARLES E. SCHAFFER
            -and-
18   GOLDENBERG SCHNEIDER LPA
     BY:  JEFFREY S. GOLDENBERG
19
     KING & SPALDING
20          Attorneys for Defendant
     BY:  CHARLES SPALDING, JR.
21          ELIZABETH D. ADLER
            PHYLLIS B. SUMNER
22

23

24

25
```

1             (Case called)

2             THE COURT:  Do we need to take appearances, or have

3   you done it sufficient on that already?

4             THE DEPUTY CLERK:  I have taken appearances, and the

5   court reporter also is aware of who is on the line.

6             THE COURT:  I am prepared to render my decision, which

7   I will do orally.

8             Plaintiffs move for final approval of a class action

9   settlement and for attorneys' fees, litigation costs and

10  expenses, and service awards.  Specifically, plaintiff moves

11  for certification of a class comprised of individuals in

12  Illinois, Colorado, and Ohio who were notified by letter or

13  e-mail by the state agencies between May 18, 2020 and May 21,

14  2020 that certain personal information they submitted to the

15  PUA systems in their respective states in connection with

16  applying for pandemic-related unemployment claims may have been

17  inadvertently exposed in the Data Security Incident for final

18  approval of the settlement pursuant to which defendant Deloitte

19  Consulting LLP will establish a settlement fund of $4.95

20  million with no right of reversion, for attorneys' fees of

21  one-third of that amount, or $1,649,835, reimbursement of

22  litigation costs and expenses of $20,509.34, and for incentive

23  awards or service awards for the class representatives of

24  $2,000 for each of the nine plaintiffs.

25            Class counsel is the law firm of Goldenberg Schneider

1  LPA, and interim liaison counsel is Kaplan Fox and Kilsheimer

2  LLP.  There is also an executive committee comprised of a

3  number of other law firms.

4         Plaintiffs are individuals in the Illinois, Colorado,

5  and Ohio who were notified that certain personal information

6  they submitted to the Pandemic Unemployment Assistance Program,

7  PUA, in their respective states in connection with applying for

8  pandemic-related unemployment claims may have been

9  inadvertently exposed as a result of a Data Security Incident.

10  They allege, in brief, that defendant failed to use reasonable

11  data security measures in designing, building, and maintaining

12  web-based portals for state agencies in Illinois, Colorado, and

13  Ohio through which individuals could apply for unemployment

14  benefits.

15         The action before the Court consolidates five separate

16  cases filed in the spring of 2020, either in this court or in

17  the federal district court for the Northern District of Ohio

18  and transferred to the Court.  They are the Culbertson,

19  Alexander, Burns, Neal, and Bozin matters.  On September 15,

20  2020, the Court appointed interim class counsel.  That's docket

21  number 79.  On September 21, 2020, plaintiffs filed a first

22  amended consolidated class action complaint in the consolidated

23  action, alleging 13 counts, all related to defendant's allege

24  failure to protect the personally identifiable information of

25  plaintiffs and class members and the harm suffered due to the

1    resulting data breach.

2          On October 21, 2020, defendant moved to dismiss the

3    consolidated class action complaint.  Plaintiffs filed their

4    opposition on November 23, 2020, and defendant filed its reply

5    in support of the motion to dismiss on December 21, 2020.

6    Before the Court was able to hold scheduled oral argument on

7    the motion and an initial pretrial conference, the parties

8    asked the Court for an adjournment to continue settlement

9    discussions.  That's at docket number 113.  On January 29,

10   2021, defendant withdrew its motion to dismiss without

11   prejudice, and the parties requested that the Court stay the

12   action so that they could continue settlement discussions.

13   Docket number 115.  The Court granted that motion.  Docket

14   number 118.  On April 30, 2021, the parties wrote the Court

15   that they had reached an agreement in principle to resolve the

16   action, following mediation before a retired United States

17   District Judge, and asked the Court to extend the stay to

18   permit them to finalize the terms of the settlement and for

19   plaintiffs to prepare a motion for preliminary approval.

20   Docket number 123.  The Court granted that motion.  Docket

21   number 124.  On August 18, 2021, plaintiffs filed a motion for

22   preliminary approval of the settlement.  Docket number 129.

23   The Court held a hearing on the motion on August 25, 2021, and

24   on August 27, 2021, the Court entered an order preliminarily

25   approving the settlement, certifying a settlement class,

approving a notice plan, and scheduling a hearing to finally

approve the settlement.  Docket number 137.

In addition to approval of the $4.95 million class

action settlement, class counsel moves for a fee award of

$1,649,835, reimbursement of litigation costs and expenses of

$20,509.34, and for incentive awards or service awards for the

class representatives of $2,000 for each of the nine

plaintiffs.

One objection to the settlement has been received.

I held a telephonic hearing on the settlement on

January 31, 2022.  The objector did not appear.  I now approve

the settlement and the award of attorneys' fees and costs but

reduce the service awards.

First, with respect to certification of the settlement

class.

Plaintiff seeks to certify a class comprised of

237,657 individuals identified on the settlement class list in

Illinois, Colorado, and Ohio, who were notified by letter or

e-mail by the state agencies between May 18, 2020 and May 21,

2020 that certain personal information they submitted to the

PUA systems in their respective states in connection with

applying for pandemic-related unemployment claims may have been

inadvertently exposed in the Data Security Incident.  On August

27, 2021, the Court preliminarily certified that settlement

class pursuant to Federal Rules of Civil Procedure 23(a) and

23(b)(3).  Plaintiffs now seek final certification of that class.

For a Rule 23(b)(3) class to be certified, it must meet the requirements of Rule 23(a), which considers numerosity, commonality of questions of law and fact, whether the claims of the named plaintiffs are typical of the class, and whether the representative parties adequately represent the class' interest.  In addition, plaintiffs must satisfy the standards of Rule 23(b)(3) that common questions predominate over individual questions and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

As a threshold matter, plaintiffs also must have standing.  The Court starts with standing.  There are several relevant principles and cases.  First, under Second Circuit law, "where multiple plaintiffs seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement."  *Barrows v. Bagnall*, 20 CV 1642 (2d Cir. Jan. 25, 2022), slip opinion at 14.  Second, the Second Circuit's decision in *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263-64 (2d Cir. 2006), holds that "no class may be certified that contains members lacking Article III standing."  *See also Barrows*, slip opinion at 15.  At this stage, the test is whether the well-pleaded allegations of the complaint establish standing.  The third relevant case

1   is *McMorris v. Carlos Lopez & Associates, LLC*, 995 F.3d 295 (2d

2   Cir. 2021) which addresses the standing of plaintiffs in data

3   breach cases.  Under *McMorris*, the unauthorized disclosure of

4   data itself is not sufficient to establish Article III

5   standing, but plaintiffs may establish standing based on an

6   increased risk of identity theft or fraud following the

7   unauthorized disclosure of their data, as long as the risk of

8   identity theft or fraud is sufficiently concrete,

9   particularized, and imminent.  The Second Circuit has

10  identified a number of factors that weigh in favor of finding

11  an Article III injury in fact, none of which is alone necessary

12  or sufficient to confer standing.  They include (1) "whether

13  the data at issue has been compromised as the result of a

14  targeted attack intended to obtain the plaintiffs' data"; (2)

15  while not necessary, whether "at least some part of the

16  comprised data set has been misused, even if plaintiffs'

17  particular data subject to the same disclosure incident has not

18  yet been affected"; and (3) the type of data at issue and

19  whether that type of data is more or less likely to subject

20  plaintiffs to a perpetual risk of identity theft or fraud once

21  it has been disclosed.

22          Although the issue is close, the Court concludes it

23  has jurisdiction under Article III and that each member of the

24  class has standing.  First, the data at issue is of the type

25  that gives rise to a substantial risk of identity theft.  It

1    includes names, Social Security numbers, as well as, in some

2    cases, home addresses, dates of birth, phone numbers, bank

3    routing numbers, and employment information.  Second, based on

4    the plea pleadings, at least some part of the compromised data

5    set has been misused.  To take a few examples, plaintiff Neal

6    alleges that as a result of the data breach, credit inquiries

7    were made in her name to open accounts that she did not

8    authorize, and she received an e-mail from a credit monitoring

9    service that there was fraudulent activity connected to her

10   e-mail account and another e-mail that someone was trying to

11   log into her account from a foreign location.  First amended

12   complaint, paragraphs 15-17.  Plaintiff Haiman was informed

13   that another bank account was opened in her name, resulting in

14   the diversion of an unemployment payment to the fraudulently

15   constructed direct deposit account.  Paragraph 28.  Fraudulent

16   activity occurred in connection with a bank account of

17   plaintiff Julius, paragraph 44, and an account of plaintiffs

18   Newland, paragraphs 53-54, and Nolen, paragraphs 62-64, and

19   plaintiff Niedelson experienced suspicious activity in his bank

20   accounts and unauthorized charges on his Costco account,

21   paragraphs 82-83.  Even if not every class member can tie

22   identity theft to the data breach, the Circuit's test does not

23   require allegations that each plaintiffs' particular data

24   subject to the same disclosure incident has not yet been

25   affected.

1           In fact, the circuit has cited with approval cases

2      holding that "allegations that other customers whose data was

3      comprised in the same data breach had reported fraudulent

4      charges on their credit cards helped establish that the

5      plaintiffs were at a substantial risk of future fraud," and has

6      stated that "evidence that plaintiffs' data is already being

7      misused, even if that misuse has not yet resulted in an actual

8      or attempted identity theft can also support a finding that

9      those plaintiffs are at a substantial risk of identity theft or

10     fraud."

11          The most difficult issue pertains to the question of

12     whether the data at issue has been compromised as the result of

13     a targeted attack intended to obtain the plaintiffs' data.  The

14     Second Circuit has described this as the most important factor.

15     Plaintiffs do not allege that the disclosure here was as a

16     result of an intentional targeted attack; it was accidental.  I

17     do not believe, however, that the absence of evidence of a

18     targeted attack leading to the data breach is fatal to standing

19     under the Second Circuit test.  The Second Circuit has stated

20     that no one of the factors is necessary; that necessarily

21     includes this factor.  Moreover, the cases that this circuit

22     relied on for the proposition, which includes the Fourth

23     Circuit's decision in *Beck v. McDonald*, 848 F.3d 262, and the

24     First Circuit's decision in *Katz v. Pershing LLC*, 672 F.3d 64,

25     turn not so much on whether the breach itself was intentional

1   but on whether the data had actually been accessed by one or

2   more unauthorized parties.  This makes good sense.  The risk of

3   identity theft does not turn entirely on whether the initial

4   data breach was targeted.  One is as much, or maybe more, at

5   risk of identity theft if his or her data, is, for example,

6   posted on the Internet after an accidental breach where it is

7   available for any party to misuse than if the breach is

8   targeted, but not targeted in a broad fashion or for the

9   purpose of using the information to the plaintiffs' detriment.

10   Here, based on the allegations that the data was not just

11   misused on one occasion and in connection with one plaintiff,

12   but on numerous occasions for numerous plaintiffs, I conclude

13   that each member of the plaintiff class has Article III

14   standing, at least at this stage of the proceedings.

15          I would also note that while there have been

16   suggestions in the papers that not each class member is

17   similarly situated and that there were class members who were

18   not at risk, the complaint pleads that the class members before

19   were similarly situated.  At this stage, where there have been

20   no facts put before the Court that refute the allegations of

21   the complaint, the Court finds that there is standing.

22          The settlement class satisfies the threshold

23   requirements of Rule 23(a).

24          On numerosity, the settlement class consists of

25   237,675 individuals in Illinois, Colorado, and Ohio.  The class

1    is so numerous that joinder of all members is impracticable.

2         The proposed class satisfies the requirement that its

3    members have common questions of law and fact.  Here common

4    questions include whether Deloitte Consulting had a duty to

5    protect class members' data and whether it breached that duty

6    by failing to enact reasonable security measures.  The proposed

7    class satisfies Rule 23(a)(2).

8         The claims of the named plaintiffs are typical of the

9    claims that would be raised by all members of the class.  The

10   same alleged unlawful conduct by Deloitte Consulting was

11   directed at or affected plaintiffs and all members of the

12   settlement class.  Each named plaintiff, like each class

13   member, received a notice regarding the PUA Data Security

14   Incident from the state agencies.  The proposed class satisfies

15   the typicality requirement of Rule 23(a)(3).

16        Class counsel has fairly and adequately protected the

17   interests of the class, as required by Rule 23(a)(4).  Named

18   plaintiffs' interests are aligned with those of the class, as

19   they are similarly situated and seeking the same relief.  Class

20   counsel has fairly and adequately represented the class as

21   demonstrated by, among other things, the work they performed on

22   the motion to dismiss, and the consolidated amended complained,

23   and on the settlement.

24        In addition to satisfying Rule 23(a), a class must

25   also satisfy one of the requirements of 23(b) in order to be

certified.  Rule 23(b)(3) requires plaintiffs to show both

predominance and superiority.  The common issues of whether

Deloitte had a duty to the class to prevent exposure of their

private data and whether Deloitte took reasonable actions to

prevent the Data Security Incident predominate over

individualized issues, based on the record that has made to the

Court.  Particularly in the settlement context, the class

action is a more efficient mechanism to resolve the disputes

than any other available methods.

So the settlement class is therefore certified.

I'll now turn to approval of the settlement.

Rule 23(e) provides that "the claims of a certified

class may be settled, voluntarily dismissed, or compromised

only with the Court's approval."  Rule 23(e)(2) requires the

Court to make certain findings in order for a settlement to be

binding on class members.  A settlement may be approved only if

it "is fair, reasonable, and adequate."

Rule 23(e)(2), as amended on December 1, 2018,

provides that if a proposed settlement "would bind class

members, the Court may approve it only after a hearing and only

on finding that it is fair, reasonable, and adequate after

considering whether:

(A) the class representatives and class counsel have

adequately represented the class;

(B) the proposal was negotiated at arm's length;

1          (C) the relief provided for the class is adequate,

2    taking into account:

3          (i) costs, risks and delay of trial and appeal;

4          (ii) the effectiveness of any proposed method of

5    distributing the relief to the class, including the method of

6    processing class member claims; and

7          (iii) the terms of any proposed award of attorneys'

8    fees, including timing of payment; and,

9          (iv) any agreement required to be identified under

10   Rule 23(e)(3); and, next,

11         the proposal treats class members equitably relative

12   to each other."

13         The Advisory Committee's notes on Rule 23(e)(2) state

14   that the goal of the amendment is not to displace any factor

15   previously adopted by any United States Court of Appeals, but

16   rather to focus the Court and the lawyers on the core concerns

17   of procedure and substance that should guide the decision

18   whether to approve the proposal."  The Advisory Committee

19   explained that, in certain jurisdictions, lengthy, multifactor

20   tests risked distracting courts and parties from focusing on

21   the key issues in a settlement review.

22         Most of the requirements set forth in the amendments

23   to Rule 23(e)(2) have long been used in the nine-factor test

24   adopted by *Detroit v. Grinnell Corp.*, 495 F.2d, 448, 463 (2d

25   Cir. 1974).  To evaluate the substantive fairness of a proposed

settlement, *Grinnell* instructs a district court to consider:
"(1) the complexity, expense, and likely duration of the
litigation; (2) the reaction of the class to the memorandum;
(3) the stage of the proceedings and the amount of discovery
completed; (4) the risks of establishing liability; (5) the
risks of establishing damages; (6) the risks of maintaining the
class action through the trial; (7) the ability of the
defendants to withstand a greater judgment; (8) the range of
reasonableness of the settlement fund in light of the best
possible recovery; and (9) the range of reasonableness of the
settlement fund to a possible recovery in light of all the
attendant risks of litigation."  In considering the review
required by 23(e), the Court has a duty "to make a considered
and detailed assessment of the reasonableness of proposed
settlements."  *Weinberger v. Kendrick*, 498 F.2d 61, 82 (2d Cir.
1982.  (Friendly, J.)

        I have considered each of these factors.  The Court
will first review the factors set forth by Rule 23(e)(2) and
then address certain of the additional *Grinnell* factors.

        First, with respect to 23(e)(2)(A), whether the class
representatives and class counsel have adequately represented
the class.  I have already discussed the issue.

        The facts and legal issues in this case are complex.
Class counsel has advocated plaintiffs' claims against
sophisticated and experienced defense counsel.

1          The Court concludes that class counsel and the named

2     plaintiffs have adequately represented the class.  The adequacy

3     of class representing on the part of class counsel and of the

4     named plaintiffs weighs in favor of the proposed settlement.

5          Second, Rule 23(e)(2)(B):  Whether the proposed

6     settlement was negotiated at arm's length.

7          As the Second Circuit has held, "a presumption of

8     fairness, adequacy, and reasonableness may attach to a class

9     settlement reached in arm's length negotiations between

10     experienced, capable counsel after meaningful discovery."

11     *Wal-Mart Stores, Inc., v. Visa U.S.A., Inc.*, 396 F.3d 96, 116

12     (2d Cir. 2005).

13          The parties here engaged in extensive arm-length

14     negotiations that culminated in an all-day mediation session

15     before a retired federal judge.  The Court concludes that the

16     settlement was negotiated at arm's length and that this factor

17     weighs in favor of approving the settlement.

18          Next, the factors regarding whether the relief

19     provided to the class is adequate under Rule 23(e)(2)(C),

20     including:

21          First, Rule 23(e)(2)(C)(i):  costs, risks, and delay

22     of trial and appeal.

23          The costs, risks, and delay of trial and appeal in

24     this case are significant, due both to the legal issues in this

25     case and the logistical complexities caused by the COVID-19

1    pandemic, as well as by the strong defense put forth by the

2    defendants.

3         The case presented challenging issues of standing and

4    injury, whether the defendant owed a duty to members of the

5    class, whether that duty was violated, and whether a class

6    could be certified.  Were the case not settled, plaintiffs

7    would have had to prevail on those issues on a motion to

8    dismiss, at summary judgment, and at trial.  There would have

9    been the need for expert testimony and expert discovery and

10   motions related to experts.  Even if named plaintiffs had

11   cleared those hurdles and prevailed at trial, defendant would

12   have had a right to appeal and plaintiffs would have had to

13   prevail on appeal.

14        All of these steps would have taken time and would

15   have been expensive.  The time, particularly to a trial, would

16   have been extended due to the COVID-19 pandemic.

17        Second, Rule 23(e)(2)(C)(ii), the effectiveness of

18   proposed method of distributing relief to the class.

19        The proposed method of distributing relief to the

20   class is extremely effective.  The parties have the contact

21   information for class members.  They have been able to reach 98

22   percent of them.  The method of allocation is fair.  Settlement

23   proceeds are being distributed to class members based on lost

24   time and, if they are able to offer proof, based on costs of

25   additional data security measures.  If there is additional

1   money left over in the settlement fund, up to $35 per class

2   member will be distributed to the class members equally.

3              Next, Rule 23(e)(2)(C)(iii):  The terms of the

4   proposed attorneys' fees, including the timing of payment.

5              Plaintiffs' counsel seeks attorneys' fees totaling

6   33.3 percent of the settlement fund, in the total amount of

7   $1,649,835 plus reimbursement of litigation costs and expenses.

8              I will have more to say about the fee request in a

9   moment.  For now, the request, which falls within the heartland

10  of fee requests in class actions, is not a basis for

11  disapproving the settlement.

12             Next, Rule 23(e)(2)(C) (iv):  Any agreement required

13  to be identified under Rule 23(e)(3).

14             Rule 23(e)(3) states:  "The parties seeking approval

15  must file a statement identifying any agreement made in

16  connection with the proposal."

17             Plaintiffs represent that there are no agreements to

18  be identified pursuant to Rule 23(e)(3).

19             The next factor I consider under Rule 23(e)(2)(C) is

20  whether the proposal treats class members equitably relative to

21  each other.

22             I have previously discussed the plan of allocation,

23  which is intended to allocate to each class member a portion of

24  the settlement fund based on their lost time and expenses.  In

25  particular, settlement class members' individual share will be

apportioned based upon their economic loss.  For self-attested

time they may submit a claim for up to four hours at $20 per

hour, and for out-of-pocket losses they may submit a claim for

reimbursement for up to $120.  Counsel estimates that at least

$850,000 of the settlement fund will remain after the payment

of all valid claims, fees, and expenses, service awards, and

notice and administrative expenses.  There are two ways that

such funds could have been distributed, the excess funds,

equally to each claimant, regardless of the value of their

original claim or proportionately in relation to the value of

their original claim.  The settlement agreement and the notice

to class members reflected that if there was an excess in the

settlement fund, it would be distributed equally.  Either

method would have been reasonable.  The distribution of the

fund equally recognizes that each class member was put at equal

risk as a result of the data breach.  The Court finds that the

plan of allocation compensates members of the class equitably.

Next, I turn to the Second Circuit's *Grinnell* factors.

As I previously mentioned, the Advisory Committee's notes to

Rule 23(e)(2) state that the goal of the recent amendments were

not intended to displace any factor adopted by the Court of

Appeals.  The Second Circuit has long used the nine-factor

*Grinnell* test to evaluate the substantive fairness of a

proposed class action settlement.

In applying Rule 23(e) to this case, I have already

1    discussed many of the *Grinnell* factors, including the

2    complexity, expense, and likely duration of the litigation, the

3    stage of the proceedings and amount of discovery, and the risks

4    of establishing liability and damages.

5           I will now discuss the remaining *Grinnell* factors.

6           Reaction of the class to the settlement.

7           All relevant deadlines submissions have passed.  There

8    have been 22,463 claims.  There is only one objection and there

9    are 11 valid exclusion requests.

10          The reaction of the class weighs strongly in favor of

11   settlement.

12          Next, the size of the settlement in the range of

13   possible recovery.

14          The parties have not submitted evidence of the

15   economic loss of the class as a whole.  However, as I will

16   discuss later, the $4.95 million settlement, which may return

17   approximately $115 to each class member, is favorable compared

18   to other settlements of data breach cases.  This factor weighs

19   in favor of settlement.

20          The risks of maintaining the class action through

21   trial.

22          This factor weighs in favor of the approval of the

23   settlement for reasons I have stated.

24          The ability of defendants to withstand a greater

25   judgment.

1          While the defendant may have the financial resources

2    to withstand a larger judgment, "the defendant's ability to

3    withstand a higher judgment, standing alone, does not suggest

4    that the settlement is unfair." *D'Amato v. Deutsche Bank*, 236

5    F.3d 78, 86 (2d Cir. 2001).  Were it otherwise, class actions

6    rarely could be settled.  This factor is afforded minimal

7    weight and is neutral towards settlement.

8          Next, notice to the class.

9          Rule 23(c)(2)(B) requires potential class members to

10   receive "the best notice that is practicable under the

11   circumstances, including individual notice to all members who

12   can be identified through reasonable effort."

13         Jenny Shawver, a project manager with the Angeion

14   Group, has submitted a declaration regarding the notice

15   procedures.  The class is comprised of 237,675 individuals, as

16   I have stated.  Angeion was able to obtain mailing addresses

17   for 236,494 people and to obtain 234,643 e-mail addresses and

18   to provide direct notice to 98 percent of the class.  It caused

19   postcard notice and claim forms to be mailed to each of the

20   addresses it had, and e-mail notice to be provided to each of

21   the e-mails that it had.  In addition, reminder notices were

22   e-mailed to class members.  Angeion maintained a website where

23   class members could file a claim directly and obtain

24   information about the settlement, and maintained a toll-free

25   hotline.

1          The Court concludes that the notice to the class

2     satisfies Rule 23(c)(2)(B).

3          Next, the objection.

4          This is a single objection to the settlement.  It

5     states:  "The amount of the settlement should be larger, given

6     the damages suffered by the class members, the attorneys' fees

7     are exorbitant, not commensurate with fees charged by other

8     attorneys and/or firms practicing in the same jurisdiction and

9     area of law, and the class representatives are being overpaid."

10         The conclusory statement that settlement should be

11    larger, given the damages suffered by the class, is not a

12    proper objection and does not weigh against settlement.  The

13    Court already has considered the size of the recovery measured

14    against the costs and risks of litigation and concluded that it

15    supports the settlement.  The objector provides no information

16    to call that conclusion into question.

17         Having considered the objection and having reviewed

18    the factors set forth by Rule 23(e)(2) and the additional

19    factors set forth in the Second Circuit's *Grinnell* decision,

20    the Court concludes that the proposed settlement is fair,

21    reasonable, and adequate.  It is therefore approved by the

22    Court.

23         Let me now move to the approval of the fee

24    application.

25         As I mentioned, class counsel seeks an attorneys' fee

1  award of $1,649,835 plus interest, or 33 percent of the $4.95

2  million settlement.

3       Class counsel also seeks $20,509.34 in costs and

4  expenses.  As noted, there is an objection that the fee award

5  is exorbitant and not commensurate with fees charged by firms

6  practicing in the same area and practice.

7       In reviewing a fee application in the class action

8  context, the "court is to act as a fiduciary who must serve as

9  a guardian of the rights of absent class members." *Central*

10 *States Southeast and Southwest Areas Health and Welfare Fund v.*

11 *Merck-Medco Managed Care, LLC*, 504 F.3d 229, 249 (2d Cir. 2007)

12 (quoting *Grinnell*, 560 F.2d at 1099).  The award "must reflect

13 the actual effort made by the attorney to benefit the class."

14 *Id.*

15      The Second Circuit provided substantial guidance to

16 the district courts on common fund fee applications in

17 *Goldberger v. Integrated Resources, Inc.*, 209 F.3d, 43 (2d Cir.

18 2000).  *Goldberger* made plain that the district court has

19 discretion to use either the lodestar or percentage method in

20 setting a fee award.  *Goldberger* lists certain factors that a

21 Court should weigh when reviewing an attorneys' fees

22 application:  "(1) the time and labor expended by counsel; (2)

23 the magnitude and complexities of the litigation; (3) the risk

24 of the litigation; (4) the quality of the representation; (5)

25 the requested fee in relation to the settlement; and (6) public

1    policy considerations.

2          *Goldberger* notes that "the lodestar remains useful as

3    a baseline even if the percentage method is eventually chosen."

4    *Id.*  It serves as "a cross check on the reasonableness of the

5    requested percentage." *Id.*  "Of course, where used as a mere

6    cross-correct, the hours documented by counsel need not be

7    exhaustively scrutinized by the district court.  Instead, the

8    reasonableness of the claimed lodestar can be tested by the

9    Court's familiarity with the case, as well as encouraged by the

10   structures of Rule 11." *Id.*  The Second Circuit's 2007 opinion

11   in *Arbor Hill Concerned Citizens Neighborhood Association v.*

12   *County of Albany*, 522 F.3d 182, 183 (2d Cir. 2007) moved

13   analysis of attorneys' fees away from the concept of a lodestar

14   in favor of "presumptively reasonable fee."  The reasonable

15   hourly rate is "what a reasonable, paying client would be

16   willing to pay." *Id.* at 184.

17          The time and labor expended by counsel.

18          The first factor in determining the reasonableness of

19   a fee request considers the time and labor expended by counsel.

20   *Goldberger*, 209 F.3d at 50.

21          At the time of the motion for class certification,

22   class counsel claimed to have spent 1,932.5 hours in this

23   litigation.  Class counsel claimed a lodestar amount of

24   $1,282,482.50 calculated at their customary rates.  Class

25   counsel now claims to have spent an additional 206.7 hours

1    implementing the settlement, equaling an additional $130,462.20

2    in fees and claim a lodestar of $1,412,944.70.  That amount is

3    not accompanied by detailed billing records, and the Court does

4    not put weight on it.

5         Class counsel spent time on this case preparing the

6    original complaints, consolidating the actions, drafting a

7    consolidated complaint, reviewing the motion to dismiss,

8    researching and drafting an opposition to the second motion to

9    dismiss, and engaging in settlement negotiations.

10        I have reviewed the detailed time records which were

11   submitted at the time of the motion for class certification.

12   The manner in which the time records were originally presented

13   made that exercise somewhat difficult.  Counsel presented the

14   time of each firm without presenting the time collectively

15   spent on the tasks.

16        Counsel since has provided information about the

17   cumulative amount of time on each of the tasks, such as factual

18   research, complaint drafting, amended complaint drafting,

19   briefing, and settlement.  I conclude that the hours reflect

20   more than reasonably necessary to reasonably litigate this

21   case.  In particular, and for example, a total of 315.60 hours

22   are listed for briefing, 275 hours are listed for settlement

23   mediation when I am told that the mediation lasted one day, and

24   a total of 411 hours are listed for

25   "communications/strategy/case management without further

1   detail.  Counsel should have spent about two-thirds of that

2   time.  To that extent, the objection that I have received has

3   merit, although, as I will explain, other factors support the

4   fee request.

5          Next, the magnitude, complexities, and risk of the

6   litigation.

7          As I previously discussed, the magnitude, complexities

8   and risks of this litigation were significant, particularly

9   given the complications posed by the COVID-19, and the

10  remaining claim itself is factually and legally complex.  Chief

11  Judge McMahon once described "the built-in risk of litigation"

12  as "a highly relevant factor in determining the fee to be

13  awarded."  *In re Veeco Instruments, Inc. Sec. Litig.*, 2007 WL

14  4115808 at *6 (S.D.N.Y. Nov. 7, 2007).  *Goldberger* instructs

15  that contingency risk must be considered in setting a

16  reasonable fee.  Plaintiff here faced serious obstacles to a

17  resolution and survived them.

18         The magnitude, complexities, and risks of this case

19  all weigh in favor of the fee request.

20         Next, the quality of the representation.

21         *Goldberger* states that the quality of representation

22  is best assessed by comparing the results of the settlement

23  against plaintiffs' maximum possible recovery.  209 F.3d at 55.

24         The $4.95 million gross recovery for the settlement

25  class is very favorable.  It is expected that each claimant

will be reimbursed for the four hours of lost time at $20 an

hour, plus receive an additional $35, for a total of $115.

Some claimants will receive more than that amount.  This

compares favorably to recoveries in other data breach cases

where the class is large, and they range from $1 to about $3,

and in recoveries in cases where the class is about the size of

the class in this case of from about $20 to $35.  Given the

risks presented by the case, the Court views this as a

favorable recovery for the class.

Plaintiffs' counsel ably navigated the early

procedural stages of this class.

The experience of counsel is also relevant in deciding

a fee award.  The law firms involved here have extensive

experience in data breaches cases.

It is also relevant to consider the quality of counsel

representing defendant.  Defendant is represented by King &

Spalding, a national firm with well-recognized expertise in

this area.

The Court concludes that the quality of representation

in this case is high and that it weighs in favor of the fee

application.

The requested fee in relation to the settlement.

Class counsel's proposed fee award constitutes 33.3

percent of the total recovery.  Plaintiffs list a large number

of class actions in which courts approved fee awards of 33.3

percent or more of total recovery, including of cases settled

for more money than this case and at this stage or at an

earlier stage.  The objector claims that the fees are not

commensurate with fees charged in this area but provides no

evidence to support that claim.

"District courts in this circuit typically approve fee

requests between 30 percent and 33 percent of the settlement,"

particularly where the case is not a large one or mega

settlement.  *Compass One* at *4.  33.3 percent is towards the

high end, but it is still reasonable.

Courts have recognized a public policy benefit in

rewarding attorneys that bring successful class actions that

foster the enforcement of federal and state laws.  Public

policy here supports an attorneys' fee award in this case.

Reaction of the class.

There has been a single objection.  The absence of

significant objections and requests for exclusions weighs in

favor of the fee applicant.

Lodestar cross-check.

*Goldberger* states that the lodestar can be used as a

useful cross-check on the reasonableness of counsel's fee

request.

As I have already stated, on a fees award of 33.3

percent, or $1,649,835, and accepting plaintiffs' hours, the

lodestar multiplier in this case would be 1.29, based on a

lodestar value of $1,228,482.50 based on 1932 and a half hours of time.

I noted that the lodestar value is overstated, as are the reported hours, which are more than would be reasonably necessary. A more appropriate lodestar amount would start with two-thirds of the claimed lodestar value, which would be $854,988. Rounding up to take into account some additional hours on the settlement since the filing of the motion for approval, I believe that the appropriate lodestar value is approximately $900,000. That would yield a lodestar multiplier of 1.833. That figure is within the range that is reasonable in these types of cases, taking into account the risk of litigating and the success achieved.

In awarding $1,649,835 in fees, the Court recognizes that the case was settled early by the parties. Had the case proceeded through discovery, the fees of class counsel would only have increased.

Having considered the objection and having reviewed the *Goldberger* factors and cross-checked the percentage fee against the lodestar, the Court overrules the objection and concludes that a fee award of $1,649,835, amounting to 33.3 percent of the class recovery, and a lodestar multiplier of approximately 1.833, is reasonable and reflects the efforts actually and reasonably performed by counsel.

Next I turn to attorney expenses.

1          Plaintiffs' counsel originally sought the

2    reimbursement of $21,091.31 in litigation costs and expenses.

3    At the hearing on January 31, 2022, I sought further

4    information on expenses which was provided on February 10,

5    2022.  Counsel now requests $20,509.34 for expense

6    reimbursement.  "Attorneys may be compensated for reasonable

7    out-of-pocket expenses incurred and customarily charged to

8    their client, as long as they were incidental and necessary to

9    the representation of those clients."  *In re Bear Cos., Inc,*

10   *Sec. Litig.*, 909 F.Supp.2d 259, 272 (S.D.N.Y. 2012).

11          The expenses include $6,290 in filing fees, $7,500 for

12   mediators, $4,079 for legal research, $2,338.34 for experts,

13   and $257 for photocopies.  The Court concludes that the

14   expenses were reasonable and incidental and necessary to the

15   representation of the class.

16          Next with respect to service awards.

17          Counsel requests service awards of $2,000 per class

18   member.  The objector contends that the class members are being

19   overpaid.  The objector provides no further basis for the

20   objection.  However, I agree that the service awards are too

21   large and will reduce them.

22          "In examining the reasonableness of service awards,

23   courts consider:  (1) the personal risk incurred by the named

24   plaintiff; (2) time and effort expended by the named

25   manufacture in assisting the prosecution of the litigation; and

1   (3) the ultimate recovery in vindicating statutory rights."

2   *Guiponne*, 2006 WL 5811888 at *8.  It is important that the

3   award be sufficient to incent a named plaintiff to come

4   forward.  In addition, in considering risk it is appropriate to

5   consider risk at the time of filing, the risk to which the

6   named plaintiff exposes himself or herself.  That includes

7   reputational risk and the risk of recrimination, as might be

8   the case, for example, when an employee brings a FLSA or

9   employment claims against a current employer.  It also includes

10  the risk of discovery.  At the same time, the Court also must

11  be vigilant that the requested service award is not so great

12  that it would give the named plaintiff an incentive to

13  compromise the rights of the class by continuing to litigate in

14  favor of the named -- compromise those rights in favor of the

15  named plaintiffs' own personal interest achieved by the

16  settlement.

17          Counsel asserts that the named plaintiffs carefully

18  reviewed pleadings, including the complaint and amended

19  complaint, regularly communicated with class counsel to keep

20  abreast of developments, and participated in settling the case.

21  Named plaintiffs have submitted affidavits regarding the work

22  they performed on the case and the hours they spent on it.  The

23  hours spent range from 45 hours on the high end for one named

24  plaintiff on the high end to 5.5 hours for another named

25  plaintiff, and 10 percent for yet another named plaintiff on

1    the lower end.  For the most part, the affidavits do not detail

2    how the time was spent.  Where there is detail, some of that is

3    for time spent as a result of the data breach itself and not as

4    a result of the litigation and, presumably, it was spent by

5    persons who are not members of the class.  The Court does not

6    put weight on that time.  Some of the time, however, was spent

7    looking for documents and providing counsel with information

8    regarding the impact of the data breach on the particular

9    plaintiff personally.  The Court does put weight on that time.

10        At argument, counsel represented that service awards

11   in data breach cases have ranged from $500 to $1500, with

12   awards going as high as $7500 when the plaintiffs have been

13   subject to discovery, including computer imaging.  In a

14   supplemental brief counsel has identified cases where service

15   awards were as high as $2,000 or $5,000.

16        The Court concludes that an award of $1500 for each

17   named plaintiff is appropriate.  An award of $2,000 is not

18   appropriate.

19        The named plaintiffs here were not deposed.  They did

20   not attend any arguments or conferences or the mediation, there

21   is no evidence they contributed any particular expertise to the

22   prosecution of the case, and they were not subject to discovery

23   of any kind.

24        There is no evidence of significant lost time or

25   expense.  There is no evidence that the named plaintiffs

1  subjected themselves to any kind of personal risk, because

2  there were nine of them.  The risk that any one individual

3  would be subject to significant discovery was somewhat measured

4  and limited.  At the same time, however, a data breach case is

5  distinctive from other types of cases in terms of the kinds of

6  information a plaintiff risks exposing in the litigation and

7  risks exposing to the public, and the Court needs to and does

8  take that into account.  The information that a plaintiff needs

9  to disclose includes the fact that their data was breached and

10 the impact of that data breach on, for example, their credit.

11 The named plaintiffs here shared information like that with

12 counsel and in their complaints, as I've indicated earlier in

13 this opinion.  They did subject themselves to the possibility

14 of being subject to discovery, and an award still must be

15 sufficient to give a plaintiff an incentive to step forward.

16         Balancing all of these factors, the Court considers an

17 award of $1500 to be appropriate.

18         That concludes the opinion of the Court.  In short,

19 the Court approves the settlement, attorney fee requests, the

20 requests for reimbursement of costs and expenses, and the

21 request for service amounts as modified by this opinion.

22         Is there anything further from plaintiff?

23         MR. GOLDENBERG:  Your Honor, we have nothing further.

24 I wanted to thank the Court for its time and also very thorough

25 and well-reasoned opinion that the Court has put together.

```
 1              THE COURT:  Thank you, Mr. Goldenberg.

 2              Anything further from the defendants?

 3              MS. SUMNER:  Your Honor, I did have one clarification

 4    relating to your Honor's statement regarding the distribution

 5    of $35 of leftover funds.  Just to ensure that it is clear that

 6    the settlement agreement provides that up to $200 could be

 7    redistributed.  I may have misunderstood your Honor's statement

 8    regarding that redistribution, but I just wanted to bring that

 9    to your attention.

10              THE COURT:  Thank you, Ms. Summer.

11              Anything further from any party?

12              Thank you, all.  Congratulations on the settlement.

13              Mr. Goldenberg, do I need to enter a formal order

14    documenting these rulings?  I think I probably do.

15              MR. GOLDENBERG:  I'd have to go back and look at the

16    settlement agreement, your Honor.  I wouldn't be surprised if

17    we include that.  That's not uncommon.  It's common.

18              THE COURT:  I will look at that.  If I need to enter a

19    formal order, I will do so.

20              Thank you, all.  Thank you to the court reporter.  And

21    congratulations.

22              (Adjourned)

23

24

25
```